UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Jane Revells,<br>Plaintiff<br><br>v.<br><br>St. Joseph Hospital of Nashua,<br>Peter Row, M.D., and Eric Hoffman, D.O.,<br>Defendants | **COMPLAINT AND**<br><br>**DEMAND FOR JURY** |

## I.   INTRODUCTION

This Complaint is brought in order to redress the Plaintiff's claims for medical negligence, vicarious liability, and violation of the New Hampshire Consumer Protection Act. The Plaintiff's claims against the Defendants are fully set forth as follows:

## II.   PARTIES

1. Plaintiff Jane Revells (hereinafter "Jane") is a citizen of the United States and currently resides at 5042 Georgia Highway 273, Jakin, County of Early, State of Georgia. At all times relevant herein, Jane was a patient of St. Joseph Hospital, Peter Row, M.D., and Eric Hoffman, D.O., the Defendants, and relied on the Defendants to meet their duty to provide competent medical care and other health care services in accordance with the accepted standard of care among similar health care providers, including, but not limited to, their duties to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge; and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

1

2.     Defendant St. Joseph Hospital of Nashua (hereinafter "St. Joseph Hospital") is a non-profit corporation with a principal place of business at 172 Kinsley Street, Nashua, County of Hillsborough, State of New Hampshire.  At all times relevant herein, St. Joseph Hospital, acted by and through its administrators, officers, employees, staff, agents, and ostensible agents for the purpose of operating its business as a hospital, medical center, and health care provider and is, therefore, liable for the negligent acts and misconduct of said administrators, officers, employees, staff, agents, and ostensible agents under the legal doctrine of vicarious liability.  At all times relevant herein, St. Joseph Hospital extended privileges to health care providers, based on a credentialing process, and held itself out to members of the general public, including Jane, as a provider of competent medical care and other health care services in its facility, in accordance with the accepted standard of care among similar health care providers, including, but not limited to, its duties to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge; and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

3.     Defendant Peter Row, M.D. (hereinafter "Dr. Row") is a physician in the Emergency Department of the Defendant, St. Joseph Hospital, and is licensed by the State of New Hampshire to practice medicine.  At all times relevant herein, Dr. Row is believed to have been employed by, credentialed by, or otherwise associated with St. Joseph Hospital and had privileges to practice medicine at St. Joseph Hospital.  As such, Dr. Row, as a physician, held himself out to members of the general public, including Jane, as a provider of competent medical

care and other health care services in accordance with the accepted standard of care among similar health care providers; Dr. Row owed Jane duties including, but not limited to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge; and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

4.	Defendant Eric Hoffman, D.O. (hereinafter "Dr. Hoffman") is a physician in the Emergency Department of the Defendant, St. Joseph Hospital, and is licensed by the State of New Hampshire to practice medicine. At all times relevant herein, Dr. Hoffman is believed to have been employed by, credentialed by, or otherwise associated with St. Joseph Hospital and had privileges to practice medicine at St. Joseph Hospital. As such, Dr. Hoffman, as a physician, held himself out to members of the general public, including Jane, as a provider of competent medical care and other health care services in accordance with the accepted standard of care among similar health care providers; Dr. Hoffman owed Jane duties including, but not limited to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge; and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

## II.     JURISDICTION

5.     This Court has federal jurisdiction over the parties and the causes of action alleged herein pursuant to 28 U.S.C. § 1332, due to the diversity of the parties and an amount in controversy exceeding $75,000.00.  Jurisdiction of this case also falls under N.H. RSA 491:7, N.H. RSA 507:9, and such other laws, rules and regulations, together with common law, of the State of New Hampshire.

## III.     FACTS

6.     On January 7, 2008, Jane began experiencing nausea, vomiting, headache, and fever.  On January 10, 2008, Jane went to the Emergency Department of St. Joseph Hospital, and reported her history of illness and now suffering a left ear ache, head congestion, and "green, bloody" nasal discharge.  After an evaluation, she was diagnosed with otitis media and received two drops of Auralgan, a medication used to treat pain and swelling caused by ear infections, in her left ear.  Jane was then discharged with prescriptions for other antibiotics and analgesics.

7.     From January 10 to January 13, 2008, Jane endured worsening symptoms of vomiting, fever, dizziness, earache, decreased hearing, decreased mobility, gait ataxia, anxiety, decreased responsiveness, and an altered mental status.  On January 13, 2008, Jane again went to the Emergency Department of St. Joseph Hospital.  Dr. Row examined Jane and ordered a head CT, laboratory blood tests, urinalysis, and a psychosocial examination.  The results of Jane's head CT scan showed "slightly enlarged stella turcica and sinusitis," while the results of Jane's laboratory blood tests displayed a high white count (21.2), with 91% neutrophils, and 3% lymphocytes.  Her urine was amber, cloudy, and contained glucose, ketones, blood, protein, leukocyte esterase, red cells, white cells, and trace bacteria.  In addition, the results of the psychosocial examination were described as "bizarre."

8. A psychiatric social worker also evaluated Jane and felt that she "may have some delirium." Surprisingly, later that day, Dr. Row diagnosed Jane with stress, vomiting, and sinusitis. He prescribed her medications for pain, nausea, and vomiting, and then discharged her. No other diagnostic tests or evaluations were ordered and conducted.

9. Dr. Row later dictated a report that stated that "it is unclear what to make of her white count given that she is known to be infected and is on antibiotics and is also known to be under biological and psychosocial stress . . . [c]onsidered in this patient's differential were intracranial lesion, fugue state, gastroenteritis and suicidal or homicidal ideation."

10. The next day, on January 14, 2008, Jane again returned to the Emergency Department of St. Joseph Hospital, with a stiff back and neck, continued feelings of lightheadedness, headache, fullness in her ears, soreness from vomiting, and decreased responsiveness. After a short evaluation, Dr. Hoffman diagnosed Jane with viral illness, sinusitis, nausea, and vomiting, and discharged her with a prescription for a medication to help with her nausea and vomiting.

11. The next day, on January 15, 2008, Jane again presented to the Emergency Department of St. Joseph Hospital for the third consecutive day, with even worsened symptoms of fever, nausea, vomiting, gait abnormalities, headache, neck pain, back pain, photophobia, restlessness, mental confusion, and nystagmus.

12. This time, Jane underwent a lumbar puncture, displaying cerebral spinal fluid that suggested that Jane was suffering from acute bacterial meningitis. The results of Jane's head CT scan also showed temporal horn dilation related to early obstructive hydrocephalus, stellar expansion, severe sphenoid and ethomoid sinusitis, and left posterior fossa calcifications. These findings were caused by several days of undiagnosed and untreated bacterial meningitis.

13. As a result, Jane was immediately admitted to the intensive care unit (ICU) for treatment of bacterial meningitis and hypokalemia, both life-threatening conditions, and received a substantial course of intravenous antibiotics.

14. The next day, on January 16, 2008, Jane underwent a brain MRI/MRA, which showed a "worrisome" left traverse sinus thrombosis extending into the left sigmoid sinus, and received intravenous heparin as treatment. Jane remained in the ICU, but experienced hypoxia, sinus tachy, weakness, continued fever, difficulty hearing, neck pain, and mottled skin.

15. Jane's condition continued to rapidly decline. The next day, on January 17, 2008, Jane experienced respiratory distress and was placed on a ventilator.

16. On January 19, 2008, she had left-sided weakness, which suggested that she had a stroke. A head CT scan showed "low density in the posterior limb of the internal capsule, compatible with small infarct." This confirmed that Jane suffered a cerebral infarct or stroke.

17. On January 21, 2008, an additional brain MRI showed that Jane had a second, new infarct, or stroke, in the right basal ganglia of her brain. As a result of these strokes, she suffered left hemiplegia, an inability to move the muscles on the left side of her body. She also experienced dysphagia, an inability to swallow, and tachyarrhythmias.

18. Jane's condition did not begin to stabilize until February 9, 2008, when she was able to withstand transport to another floor in the hospital for inpatient multidisciplinary rehabilitation, a very arduous process.

19. Jane remained in the rehabilitation unit until April 1, 2008, when she was transferred to a sub-acute facility for continual care, including, but not limited to physical and occupational therapies. As a result of her injuries, even after extensive rehabilitation and prolonged convalescence, Jane cannot walk without the support of a cane and when she is able to

move, she can do so only minimally and at a very slow pace. In addition, she has extremely limited use of her left arm, hand, and leg and has fallen multiple times. She requires constant care and is permanently disabled and unable to return to full-time employment as a kitchen designer, a successful livelihood that she enjoyed before her injuries.

### IV.     CLAIMS OF LIABILITY

### COUNT I
### (Medical Negligence- Against Peter Row, M.D.)

20.     The Plaintiff repeats and incorporates herein by reference each and every paragraph that appears above and below.

21.     The Defendant, Dr. Row, as a physician, held himself out to members of the general public, including the Plaintiff, as a provider of competent medical care and other health care services in accordance with the accepted standard of care among similar health care providers, including, but not limited to, his duties to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge; and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

22.     Despite the aforesaid duties and in breach thereof, Dr. Row negligently failed to exercise reasonable care in providing competent medical care in accordance with the accepted standard of care among emergency medicine physicians, negligently failed to take all reasonable actions and measures to protect the Plaintiff from foreseeable injury, negligently failed to timely examine, test, and diagnose the Plaintiff's severe symptoms, negligently failed to provide appropriate and adequate treatments and care to the Plaintiff, negligently failed to stabilize the

Plaintiff and manage her symptoms before discharge, and otherwise negligently failed to exercise due care.

23. As a direct and foreseeable consequence of said breach of care, the Plaintiff suffered injuries, some of which are permanent, including, but not limited to severe bacterial meningitis, hypokalemia, cerebral infarct, permanent left hemiplegia, altered mental status, abnormal gait, dysphagia, tachyarrhythmias, hypoxia, extraordinary pain and distress, weakness, and prolonged hospitalization, rehabilitation, and convalescence, together with the costs and expenses associated therewith, past, present, and future.

24. The breach of the standard of care by Dr. Row was wanton, malicious, or oppressive, and as such, the Plaintiff is entitled to enhanced compensatory damages. At all times relevant herein, the Defendant's actions and failure to act constituted gross misconduct with disregard or reckless indifference for the Plaintiff's safety, as a member of the general public.

## COUNT II
### (Medical Negligence- Against Eric Hoffman, D.O.)

25. The Plaintiff repeats and incorporates herein by reference each and every paragraph that appears above and below.

26. The Defendant, Dr. Hoffman, as a physician, held himself out to members of the general public, including the Plaintiff, as a provider of competent medical care and other health care services in accordance with the accepted standard of care among similar health care providers, including, but not limited to, his duties to: a) protect members of the general public, including Jane, from foreseeable injury by practicing within the standard of care; b) timely examine, test, and diagnose any and all symptoms reported by a patient; c) provide appropriate and adequate short-term and long-term care to a patient; d) stabilize a patient before discharge;

and e) otherwise provide medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

27.  Despite the aforesaid duties and in breach thereof, Dr. Hoffman negligently failed to exercise reasonable care in providing medical care in accordance with the accepted standard of care among emergency medicine physicians, negligently failed to take all reasonable actions and measures to protect the Plaintiff from foreseeable injury, negligently failed to timely examine, test, and diagnose the Plaintiff's severe symptoms, negligently failed to provide appropriate and adequate treatments and care to the Plaintiff, negligently failed to stabilize the Plaintiff and manage her symptoms before discharge, and otherwise negligently failed to exercise due care.

28.  As a direct and foreseeable consequence of said breach of care, the Plaintiff suffered injuries, some of which are permanent, including, but not limited to severe bacterial meningitis, hypokalemia, cerebral infarct, permanent left hemiplegia, altered mental status, abnormal gait, dysphagia, tachyarrhythmias, hypoxia, extraordinary pain and distress, weakness, and prolonged hospitalization, rehabilitation, and convalescence, together with the costs and expenses associated therewith, past, present, and future.

29.  The breach of the standard of care by Dr. Hoffman was wanton, malicious, or oppressive, and as such, the Plaintiff is entitled to enhanced compensatory damages.  At all times relevant herein, the Defendant's actions and failure to act constituted gross misconduct with disregard or reckless indifference for the Plaintiff's safety, as a member of the general public.

**COUNT III**
**(Vicarious Liability- Against St. Joseph Hospital)**

30.  The Plaintiff repeats and incorporates herein by reference each and every paragraph that appears above and below.

31. At all times relevant, Defendants Dr. Row and Dr. Hoffman were employees, agents, or co-joint venturers of Defendant St. Joseph Hospital, and acted within the scope of their employment, agency, or joint venture.

32. Therefore, St. Joseph Hospital is vicariously liable for the catastrophic and permanent injuries, the emotional harm, and any other damages, as alleged herein, caused to the Plaintiff by the Defendants' negligent acts and other misconduct.

## COUNT IV
### (Consumer Protection Violation Claim Under N.H. RSA 358-A- Against All Defendants)

33. The Plaintiff repeats and incorporates herein by reference each and every paragraph that appears above and below.

34. At all times relevant, the Defendants advertised, promoted, and otherwise offered their services to the general public, including the Plaintiff, and represented that they were competent to provide medical care and other health care services, in accordance with the accepted standard of care among similar health care providers; that their services were a particular standard of quality; that their services included: a) the protection of members of the general public from foreseeable injury; b) the timely examination, test, and diagnosis of any and all symptoms reported by a patient; c) the provision of appropriate and adequate short-term and long-term treatment(s) and care to a patient; d) the stabilization of a patient before discharge; and e) the provision of any other medical services that a reasonably prudent and competent health care provider would administer and/or order under the same or similar circumstances.

35. In fact, the Defendants failed to provide the services represented, despite the fact that they knew, or reasonably should have known, that the Plaintiff's severe symptoms, her overall condition, and her repeated visits to the Emergency Department over a short period of time warranted further diagnostic testing and admission to the hospital, that the Plaintiff's serious

10

health condition, which would only worsen without appropriate and timely treatment, created a threat of severe injury to her long-term health and wellness, and that the risk of harm to the Plaintiff's health and welfare posed by this serious health condition outweighed the costs to the Defendants of reducing or eliminating such risk by conducting timely diagnostic testing and admitting the Plaintiff to the hospital for appropriate treatment within a critical time period.

36. The Defendants violated N.H. RSA 358-A:2, in that they represented that their services were of a particular standard, quality, or grade.

37. The misconduct of the Defendants was wanton, malicious, or oppressive, and as such, the Plaintiff is entitled to enhanced compensatory damages. At all times relevant herein, the Defendants' actions and failure to act constituted gross misconduct with disregard or reckless indifference for the Plaintiff's safety, as a member of the general public.

## V. DAMAGES

38. The Plaintiff repeats and incorporates herein by reference each and every paragraph that appears above and below.

39. The Plaintiff alleges that as a direct, foreseeable, and consequential result of the Defendants' actions, breaches of duty, and failures to act, as detailed herein, she has suffered the following damages:

    A. Catastrophic and permanent physical injuries, including, but not limited to severe bacterial meningitis, hypokalemia, cerebral infarct, left hemiplegia, altered mental status, abnormal gait, dysphagia, tachyarrhythmias, hypoxia, extraordinary pain and distress, weakness, and prolonged hospitalization, rehabilitation, and convalescence, together with the costs and expenses associated therewith, past, present, and future;

B. Severe emotional distress, pain, and suffering, including, but not limited to anxiety, fear, stress, depression, and loss of enjoyment of life;

C. Numerous, substantial hospital and other medical expenses associated with necessary medical tests, evaluations, procedures, medications, rehabilitation, and other treatments;

D. Lost wages, past, present, and future, together with the value of any and all incidental benefits including, but not limited to life insurance, incoming disability insurance, health care insurance, and an additional financial award as liquidated damages;

E. Lost earning capacity;

F. Treble damages, together with costs and lawful interest thereon, as the Defendants' acts were reckless or wanton, as alleged herein;

G. Enhanced compensatory damages, as the Defendants' conduct rose to the level of reckless indifference or disregard of the consequences to the Plaintiff that ultimately caused the Plaintiff's injuries, as alleged herein; and

H. Costs and reasonable expert witness fees, together with lawful interest thereon, and other extraordinary expenses, injuries, and losses.

40. The Plaintiff respectfully requests a jury trial in this case.

Respectfully submitted,
Jane Revells, Plaintiff
By and through her attorneys,
BELIVEAU, FRADETTE, DOYLE & GALLANT, PA

Dated: October 26, 2010   By:__/s/ Richard E. Fradette_____
Richard E. Fradette, Esquire
Bar No. 844
Christina A. Ferrari, Esq.
Bar No. 19836
91 Bay Street - P.O. Box 3150
Manchester, NH 03105-3150
(603) 623-1234